UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**TYLER MARX,**<br><br>      Defendant. | No. 23-CR-323 |

**TYLER MARX SENTENCING MEMORANDUM**

Defendant Tyler Marx, through counsel, respectfully submits this memorandum in advance of his sentencing on February 23, 2026.

**I.    INTRODUCTION**

Tyler appears before the Court before the Court sentencing. He has accepted responsibility for his role in a conspiracy to defraud investors in 1CR and Belacoin, pled guilty to conspiracy in violation of 18 U.S.C. § 371, stipulated to a Guidelines loss range based on intended loss, and will pay full restitution for all identified victims. Mr. Marx does not minimize his conduct or the intended harm.

The advisory Guidelines range in the draft Presentence Investigation Report ("PSR") is 18–24 months (Total Offense Level 15, Criminal History Category I). Defense objections (as discussed below) would reduce that range to 12–18 months (Total Offense Level 13). As discussed below, there are numerous factors here weighing in favor of such a non-custodial sentence.

- Mr. Marx was 18–20 years old during the relevant conduct; he has no prior criminal history and qualifies as a "zero-point offender."

- He will pay the $12,486.98 in restitution owed to the eight identified victims at the time of sentencing.

- In the five years since he became aware of the Government's investigation, he has exhibited exemplary behavior—he graduated from college, became gainfully employed, got married, and, perhaps most importantly, he became a father.

For these reasons and those set forth below, and in light of the factors in 18 U.S.C. § 3553(a), Mr. Marx respectfully submits that a sentence of probation (and, at most, limited home confinement if the Court deems it necessary) is sufficient but not greater than necessary to achieve the purposes of sentencing.

## II.    TYLER'S BACKGROUND AND CHARACTER

A. Upbringing, Education, and Family

The PSR reflects that Mr. Marx, now 27 years old, was born and raised in Norfolk and Virginia Beach, Virginia, in a stable, intact, upper middle-class household. His parents have been married for decades; both sets of grandparents and extended family lived nearby; and he grew up in an environment that valued work, integrity, and faith.

Academically, Mr. Marx excelled. He completed advanced academic tracks through middle and high school and graduated from Princess Anne High School with an International Baccalaureate ("IB") diploma, maintaining straight-A grades and earning approximately 30 college credits through AP and IB examinations. He then graduated from the University of Virginia in 2020 with a B.A. in Economics.

From a young age, he was drawn to building things. He taught himself coding and web design as a teenager, and later co-founded Belacam and related ventures. While those efforts

eventually gave rise to the offense conduct in this case, they also reflected an entrepreneurial drive that continues to this day.

Now, Mr. Marx lives at and operates the Church Point Manor, a historic property and wedding venue in Virginia Beach that he and his family have restored and reopened to the public. His parents live in a separate house on the same property. Mr. Marx and his wife, Mary Kate, whom he married in 2022 after knowing her since high school, manage a business that hosts approximately 30 weddings per year and numerous other events; it is the setting for some of the most important days in their clients' lives.

In July 2025, Tyler and Mary Kate welcomed their first child, Violet. The PSR and letters document a close, supportive marriage in which Mr. Marx shares both business and household responsibilities in addition to being an active new father to Violet.

B. <u>Mental Health and Stability</u>

Mr. Marx has experienced anxiety since adolescence and has been in therapy for many years, first with a psychiatrist at Eastern Virginia Medical School and more recently with a physician assistant at Mid-Atlantic Family Medicine. He has taken sertraline (Zoloft) since 2020, with occasional low-dose benzodiazepine use, and reports good symptom control. He has no history of psychosis, suicidal ideation, or substance abuse.

These mental-health issues have been managed successfully—he has maintained employment and complied with supervision. Incarceration of any type would interrupt a treatment regimen that has worked and is unnecessary to meet any treatment need.

C. <u>Work Ethic and Character: Letters of Support</u>

The letters submitted by family and friends provide a consistent and detailed portrait of Mr. Marx's character—who he has been in the years before and after the offense.

**Loyalty and presence in crisis**. Childhood friend Dylan D'Andrea describes meeting Mr. Marx in high school and truly coming to know him when Dylan's brother died by suicide. *See* Ex. A [Dylan D'Andrea letter]. Long after others' attention faded, Mr. Marx "constantly check[ed] in" and would "be [there] on [Dylan's] best and worst days," providing support that did not wane with time. Years later, when Dylan's father was diagnosed with terminal cancer, Mr. Marx secured him a job at his parents' business so he could be near his father, and repeatedly and freely opened his home to provide food and a place to sleep whenever Dylan needed a break.

**Service to community**. Dylan also recounts Mr. Marx's work restoring the Church Point property and reopening it as a historical landmark and wedding venue, "helping people celebrate some of the happiest days of their lives," as well as volunteering together at the Allen Stone Memorial Race and raising money to benefit the Navy SEAL Foundation and local rescue squads.

**Devoted husband and father**. Mary Kate Marx explains that Tyler attended every prenatal appointment, took on her duties at their venue when pregnancy made the work physically taxing, and effectively worked "two full-time jobs"—the physical labor of the venue and the administrative and coordination work—while also preparing for fatherhood. *See* Ex. B [Letter of Mary Kate]. After Violet's birth, he remained "the most present father," handling overnight care and continuing to meet the demands of their business.

**Conservative, skeptical in-laws' trust**. Mary Kate's father, retired Marine officer Neil McNulty, describes himself as someone who scrutinizes his daughters' suitors with "very high" standards and notes that Mr. Marx is the only young man he can recall who consistently addressed him as "Sir" until told otherwise. *See* Ex. C [Letter of Neil McNulty]. He came to see Mr. Marx as caring, humble, and respectful, with impressive academic and entrepreneurial

4

accomplishments, and now regards him as "a wonderful and loving husband and father" and "a valuable citizen who has always helped people."

**Consistent empathy and work ethic**. Mr. Marx's mother, Holly, writes of her son's "honest, hard-working, loyal, courteous … [and] profoundly empathetic" character and of his pride in "selflessly creating joyful and heartwarming experiences for strangers" at the Manor. *See* Ex. D [Letter of Holly Marx]. His father, Jim, describes his son's years of volunteer work with children and with a camp for children with autism, where Tyler was repeatedly assigned to the most challenging campers because of his patience and persistence. *See* Ex. E [Letter of Jim Marx].

**Support, friendship and mentorship**. His sister, Kylie, recalls nights when he sat with her at the kitchen table and patiently worked through math problems until the material finally "clicked," transforming her weakest subject into a strength. *See* Ex. F [Letter of Kylie Marx]. She describes him as someone who finds joy in ordinary tasks, approaches an "unkind world with profound care and gentleness," and is now a doting father who wakes for every feeding and changing. Lifelong friend and D.C. attorney Harrison Martingayle calls Mr. Marx "among the most thoughtful, intelligent, and compassionate people" he has known and credits their friendship with making him "a better person." *See* Ex. G [Letter of Harrison Martingayle]. He notes that Mr. Marx's curiosity and ability to make complex subjects understandable have helped others realize their potential.

These letters are not offered to excuse Mr. Marx's conduct. They demonstrate that this offense is profoundly inconsistent with his enduring character and is an aberration in a life driven by purpose. Mr. Marx is deeply remorseful, and he has spent the years since building a life grounded in family, lawful work, and service. *See* Ex. H [Letter of Tyler Marx].

### III. THE OFFENSE CONDUCT

Mr. Marx pled guilty to a one-count superseding information arising from his and co-defendant Tanner Roughton's promotion and trading of two alt-coins, 1CR and Belacoin, between 2016 and 2018.

As the government's change-of-plea memorandum and PSR reflect, the core conduct is not in dispute. While college freshmen and sophomores, Mr. Marx and Mr. Roughton took control of 1CR and later Belacoin, promoted them aggressively in online forums, and made misleading statements, often in the third person, about who controlled the projects and their prospects. They traded while promoting, benefitting from price and volume increases that their own statements and activity helped generate.

The parties' plea agreement stipulates, for Guidelines purposes, that Mr. Marx conspired to defraud investors of between $250,000 and $550,000 in intended loss. And while the PSR further notes a market-wide "actual loss" figure of $487,855, as set forth below, the defense objections and subsequent expert work indicate that this "actual loss" figure selectively excludes some relevant traders and that the overall market—including traders who bought coins outside of the Poloniex exchange—appears to have realized a net gain rather than a net loss. None of this, of course, diminishes the reality that eight identified individuals suffered actual, compensable losses. The PSR lists those victims and their total harm—$12,486.98—which Mr. Marx stands ready to pay at sentencing.

Mr. Marx does not dispute that he lied. He does not dispute that some investors were harmed. He acknowledges that his conduct undermined the integrity of the markets in which he operated and that, even in a speculative, "scam-heavy" environment, honesty from market participants is critical. However, what is equally important is that the active, admitted conduct

centers on a finite period, from September 2016 through approximately May 2018, when Belacoin was delisted from Poloniex. And, after significant debate between the parties, some of which was contained in Court filings, the government chose to resolve the case via a single conspiracy count under § 371, with a five-year statutory maximum, rather than the substantive wire-fraud counts and forfeiture originally charged.

### IV. THE 18 U.S.C. § 3553(a) FACTORS

The Guidelines are of course the "starting point and initial benchmark," but they are not the end of the analysis. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court must fashion a sentence that is sufficient, but not greater than necessary, to satisfy the purposes in § 3553(a). In this case, those factors strongly support a non-custodial sentence.

#### A. Nature and Circumstances of the Offense

The parties agree that this was a serious offense. In a speculative alt-coin market, Mr. Marx and Mr. Roughton promoted 1CR and Belacoin through misleading statements, traded while promoting, and profited from the price increases.

At the same time, this case differs materially from more aggravated frauds. There were no vulnerable victims targeted as such. Most participants were sophisticated enough to trade in complex crypto markets. The forums used for promotion by Marx and Roughton had limited public visibility, and many traders used electronic "bots" that traded on their behalf. The Belacam project that Marx promised was successfully developed and delivered. Mr. Marx did not occupy a traditional fiduciary role. He did not steal from clients, embezzle funds, or misappropriate entrusted savings. He engaged in market manipulation and misrepresentation in a speculative environment. The conduct occurred years ago when Mr. Marx was young. The criminal conduct took place when Tyler was a teenager, still in college, operating in a largely

unregulated market that he now recognizes he did not fully understand. The operative period of the scheme is finite—approximately September 2016 through May 2018. In the years since, Mr. Marx has engaged in exemplary behavior.

### B. History and Characteristics of the Defendant

The "history and characteristics of" Mr. Marx cut sharply in favor of leniency.

- **No criminal history; exemplary supervision.** Mr. Marx has zero criminal history points, qualifies as a "zero-point offender," and has complied fully with all conditions of release for more than two years.

- **Documented anxiety, responsibly treated.** His longstanding anxiety has been managed through therapy and medication; he has used that treatment appropriately and has remained fully functional.

- **Deep family and community ties.** He lives on a family property with his parents and hosts weekly dinners with his in-laws; four generations live within ten minutes of each other. He speaks daily with his parents, discussing work, plans, and his daughter.

- **Sustained lawful work and entrepreneurship.** As exemplary student, Mr. Marx graduated from the University of Virginia in 2020. Since 2021, he has operated the Church Point Manor, performing physically demanding, hands-on work, cleaning guest rooms and bathrooms, doing repairs, landscaping, and managing events, alongside his wife.

- **Caregiving obligations.** He is a primary caregiver to his infant daughter, waking at night, changing diapers, and ensuring her needs are met, while supporting his wife's mental health and the family business.

It is not just Mr. Marx who makes these points. Rather, the letters from family and friends collectively establish that Tyler is consistently loyal and present in others' hardest moments, as Dylan's account of Mr. Marx's support during family tragedy makes clear. Tyler is deeply committed to service, from working with children with autism and serving on church youth staff to volunteering at charity races and operating a venue that hosts weddings and community events. He is an unusually devoted husband and father, whose presence in the home is essential to his daughter's care and his wife's well-being. He is regarded by those who know him best, including a conservative retired Marine officer and a fellow lawyer, as a person of integrity and promise, whose missteps in the alt-coin markets are out of character and unlikely to be repeated.

In short, the record reflects genuine remorse and contrition. Mr. Marx has accepted responsibility, agreed to substantial intended-loss figures for Guidelines purposes, and has engaged in meaningful post-college work that helps his family and the community.

### C. Specific and General Deterrence

**Specific deterrence**. The need to deter Mr. Marx personally is not a factor here. He has lived under investigation and indictment for years, with no further deviations towards criminal activity. He has incurred the serious collateral consequences of a felony conviction, including permanent loss of voting rights in Virginia. And, he has demonstrated, through stable work and family life, that he has definitively exited the world in which the offense occurred. The government itself concludes that his chances of recidivism are "very low." A term of probation, with appropriate conditions, is more than sufficient to ensure he does not reoffend.

**General Deterrence**. There is a legitimate need to deter similar misconduct in cryptocurrency markets, which the government describes as a "cesspool" of criminality in some

corners. But general deterrence does not require incarceration in every case. Any reasonable crypto entrepreneur will see that Tyler is now a convicted felon, subject to supervision, financial penalties, restitution and permanent reputational harm. Tyler has also spent years under investigation and indictment.

That message means that those who defraud will be held to account. However, those who come forward and accept responsibility may avoid prison but will live with serious, enduring consequences.

### D. Protection of the Public

There is no need "to protect the public from further crimes" of Mr. Marx. Rather, the public is better protected (and has been better protected) by leaving Mr. Marx *in the community*.

*First*, his risk of recidivism is low for the reasons already discussed: age at offense, absence of criminal history, stable marriage, strong family support, lawful employment, and demonstrated prosocial use of technical skills.

### E. Need for Treatment, Education, or Vocational Training

Mr. Marx does not require educational or vocational training. Tyler is a brilliant college graduate and has developed substantial technical and practical skills on his own, which he currently employs in operating his own successful business.

### G. Restitution

Finally, the need to provide restitution is fully addressed. The PSR and Plea Agreement identify eight victims and total restitution of $12,486.98, which the Court must order under the Mandatory Victims Restitution Act. Mr. Marx stands ready to make this payment when ordered.

## VI.   TYLER'S OBJECTIONS TO THE PSR

As the Court is aware, Mr. Marx has made a number of objections related to how the PSR describes offense conduct in this case and the applicable guideline range. *See*, e.g., PSR ¶¶1–3, 8; PSR-Corrections. These objections are appropriate in a case involving a young defendant, a novel market, and complex trading data. Indeed, as in many white-collar cases, there is room for reasonable disagreement over how to characterize the full scope and impact of the scheme, particularly where, as here, numerous experts were involved in analyzing the significant amount of trading data. It should not, however, obscure Mr. Marx's complete and total acceptance of responsibility for conspiring with Tanner Roughton. The defense will rely on the objections to the PSR for its arguments but will highlight a few important issues for this Court's consideration at sentencing.

*First*, the admitted offense period is substantially shorter than the initial PSR suggests. As reflected in the change-of-plea factual basis, the government's Bill of Particulars, and the parties' expert analyses, the charged conduct centers on the period from approximately September 2016 through May 2018, when 1CR and Bela were being promoted and traded and before Bela was delisted. The time-period is important because it demonstrates that the conduct was isolated, youthful conduct spanning roughly his first two years of college, not an ongoing fraud extending into 2020.

*Second*, the parties' Plea Agreement stipulates to an intended loss range of $250,000–$550,000, which supports the 12-level enhancement under §2B1.1(b)(1). The draft PSR additionally cites a market-wide "actual loss" figure of $487,855 based on the Government's expert analysis. However, the defense has identified a specific coding filter in that analysis: a filter that excluded approximately 957 traders—many of whom purchased coins during the promotional period on other exchanges and realized substantial profits—from the loss calculation. When the code is updated to match the expert's stated methodology, the combined 1CR and Belacoin markets appear to show a net gain and not a net loss.

The defense is not asking the Court to revisit the intended-loss stipulation or hold a hearing; Mr. Marx stands by it. The defense simply asks that the PSR and the Court avoid treating $487,855 as a reliable figure for "actual" market-wide loss, as opposed to the discrete, provable losses of the eight restitution victims. At a minimum, this uncertainty about actual loss supports the conclusion that the intended-loss enhancement, while binding for Guidelines purposes, overstates the real-world harm and should be weighed accordingly under § 3553(a).

*Third*, the PSR applies a two-level enhancement under § 2B1.1(b)(2)(A), asserting that the offense "involved 10 or more victims and was also committed through mass-marketing." The defense respectfully objects.

As to victim count, the PSR's own restitution table identifies eight victims. The government's sentencing memorandum notes that many traders in these markets were running their own scams or regarded their activity as gambling, and it has not sought to identify or prove additional victims who suffered actual loss. Under § 2B1.1(b)(2) and relevant case law, estimates or broad assertions about "traders who lost money" are insufficient; the enhancement requires 10

or more persons who "sustained any part of the actual loss." U.S.S.G. § 2B1.1 cmt. n.1. This showing has not been made.

As to "mass-marketing," the conduct here involved posts in open chatrooms and forums frequented by traders who chose to participate in the alt-coin market. There is no evidence of targeted email blasts, purchased lead lists, direct mail campaigns, or other structured solicitations of the general public. The Sentencing Commission's commentary requires a "plan, program, promotion, or campaign that is conducted through solicitation" to induce a large number of persons to invest. U.S.S.G. § 2B1.1 cmt. n.4(A). The conduct here involves college students posting in public chatrooms, often urging readers to "research [1CR] for yourself" rather than "blindly trust[ing]" them, which do not fit within that definition.

Even if the Court ultimately determines that the enhancement technically applies, these issues demonstrate that the victim-count and mass-marketing adjustments overstate the seriousness of the offense and should be discounted in the § 3553(a) analysis.

*Fourth*, the offense narrative appears to track the earlier plea materials in Mr. Roughton's case rather than the stipulated facts in Mr. Marx's change-of-plea memorandum and the current expert record. Among other things, those paragraphs refer to "match trades" that did not occur; treats the original $487,855 "loss" figure as an established fact rather than intended loss; and, attributes to Mr. Marx approximately $3.5 million in Belacoin withdrawals, while both parties' now estimate his profits from Belacoin trading at approximately $1.4 million.

The defense respectfully requests that these paragraphs be revised to conform to the change-of-plea factual basis and the updated expert analyses. Regardless, the Court can and should rely on the more recent, mutually recognized facts from the Change of Plea memo when assessing § 3553(a).

## VII. Conclusion

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. In this case the offense is serious, but finite in scope, committed by a very young first-time offender in a chaotic market. Mr. Marx has accepted responsibility, agreed to substantial intended-loss figures, and will pay full restitution for all identifiable victims. He has no prior record, has complied perfectly with supervision, and has built a stable life as a husband, father, and small-business owner. Last, the goals of punishment, deterrence, and protection of the public can be fully achieved through a term of probation with appropriate conditions, restitution, and a fine.

For these reasons, Mr. Marx respectfully asks the Court to impose a sentence of probation, restitution of $12,486.98, and such fine as the Court deems just, and to find that such a sentence is sufficient, but not greater than necessary, to satisfy the purposes of § 3553(a).

Dated: February 9, 2026

>                                    Respectfully submitted,
>
>                                    */s/ Eric S. Rosen*
>                                    Eric S. Rosen
>                                    DYNAMIS LLP
>                                    175 Federal Street, Suite 1200
>                                    Boston, MA 02110
>                                    (617) 693-9732
>                                    erosen@dynamisllp.com
>                                    *Attorney for Tyler Marx*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be publicly filed on ECF.

/s/ Eric S. Rosen

Eric S. Rosen