**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 23-323** |
| | : | |
| **TYLER MARX** | : | |
| | : | |

---

**Diamond, J.**                                                                                          **April 7, 2026**

**<u>MEMORANDUM</u>**

Tyler Marx moves for bail while he raises meritless issues on appeal—issues he gave up when he pled guilty to wire fraud and waived again at sentencing.  Marx urges that his appeal is not for the purpose of delaying his incarceration because he has begun serving the sentence I imposed, thus ignoring that he seeks release while he appeals.  <u>See</u> <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 214 (1947) (Jackson, J., dissenting) ("Now I realize fully what Mark Twain meant when he said, 'The more  you explain it,  the more I don't understand it.'").    In  any  event,  at  his sentencing hearing (which had been continued four times), Marx failed to present evidence that he is not a flight risk.  To the contrary, his net worth—over $4 million (nearly $2 million in cash and liquid assets)—would facilitate flight.  In these circumstances, I will deny his Motion.

**I.      BACKGROUND**

On February 6, 2024, Marx pled guilty to conspiracy to commit wire fraud.  (Doc. Nos. 128, 132); 18 U.S.C. § 371.  Marx admitted that over almost two years, he and co-conspirator Tanner Roughton had fraudulently inflated the value of cryptocurrencies "1CR" and "Belacoin." (<u>See</u> Doc. No. 173 ("Govt. COP Memo"); Doc. No. 154 at 18:7–19:12.)  It was undisputed: (1) that Roughton and Marx together made $150,000 on 1CR; and (2) that Marx "profit[ed]" 1.4 million from Belacoin; Roughton $92,000.  (PSR at 22; <u>id.</u> ¶¶ 17, 23.)  Although the Government showed that Marx and Roughton's victims had lost $487,855, because only eight victims could be

1

identified, Marx's restitution amount was limited to $12,486.98.  (PSR ¶¶ 24–25; Tr. 5:2–6.)

Marx's Guilty Plea Agreement provided that I could impose a sentence up to the statutory maximum of "5 years' imprisonment, a 3-year period of supervised release, a fine of $250,000 or twice the gross gain or gross loss as determined by the Court, whatever figure is greater, . . . a $100 special assessment," and "[f]ull restitution of as much as $550,000."  (Doc. No. 131 ¶ 4.)  With exceptions inapplicable here, Marx "voluntarily and expressly waive[d] all rights to file any appeal, any collateral attack, or any other writ or motion that challenges" his "sentence."  (Id. ¶ 13.)

Roughton had earlier pled guilty to conspiracy to commit wire fraud, wire fraud, and tax evasion.  United States v. Roughton, No. 21-110 (E.D. Pa.), ECF Nos. 1, 7; 18 U.S.C. §§ 1343, 1349; 26 U.S.C. § 7201.  On April 30, 2025, I sentenced Roughton to 3 years' probation, $26,372.98 in restitution, a fine of $4,000, and a $300 special assessment.  United States v. Roughton, No. 21-110 (E.D. Pa.), ECF Nos. 56, 57.

At the Parties' joint request, I repeatedly continued Marx's sentencing: from May 27, 2025 to October 20, 2025; then to December 9, 2025; then to February 23, 2026.  (Doc. Nos. 136, 137, 138, 142.)  Finally, because of inclement weather, I granted Marx's request again to continue his sentencing hearing to March 23, 2026.  (Doc. Nos. 152, 153.)  At that hearing, I noted (without objection) the calculations in the Presentence Report: that Marx had been dominant in the cryptocurrency fraud, profiting almost $1.5 million; co-conspirator Roughton had profited only $92,000. (Tr. 14:5–17:19.)  Marx's adjusted Guidelines range was 8 to 14 months' imprisonment. (Sealed Tr. 6:24–7:8.)  After considering the § 3553(a) factors and the Parties' contentions, I announced that I intended to impose the following sentence: 12 months' and one day of imprisonment, 3 years' supervised release, $12,486.98 in restitution, a fine of $500,000, and a

2

$100 special assessment.  (Tr. 19:24–20:9.)  When I asked Marx's lawyer whether there was "any reason" why that sentence "should not be imposed," he replied "No, Your Honor."  (Id. 20:10–12.)  I thus imposed the sentence as announced.  (Id. 20:17–23:25.)  Marx's only objection was to my decision to detain him.  (Id. 24:21–26:1; Sealed Tr. 7:19–24.)

Marx has now appealed his sentence, and asks me to release him pending that appeal.  (Doc. Nos. 160, 162); 18 U.S.C. § 3143(b).  He argues that he is not a flight risk or a danger to the community.  (Doc. No. 162 at 4–6.)  The Government "agrees that [Marx] is not likely to flee and that he does not pose a danger to the safety of the community," but it does not take a position on Marx's Motion.  (Doc. No. 166 at 2–3.)  I did not find that Marx is a danger to the community. Rather, I found that he had failed to show he is not a flight risk, and ordered his detention.  (Tr. 25:9–26:1.)

## II.    LEGAL STANDARDS

Absent certain exceptions (which do not apply here), "a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal" shall "be detained, unless" he shows:

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--
>
> > (i) reversal,
> >
> > (ii) an order for a new trial,
> >
> > (iii) a sentence that does not include a term of imprisonment, or
> >
> > (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b); United States v. Smith, 793 F.2d 85 (3d Cir. 1986).  The defendant has the burden of proof.  United States v. Miller, 753 F.2d 19, 24 (3d Cir. 1985).

To be "substantial," a question of law must "be significant in addition to being novel, not governed by controlling precedent or fairly doubtful."  Smith, 793 F.2d at 88.  "A question is substantial if the defendant can demonstrate that it is 'fairly debatable' or is 'debatable among jurists of reason.'"  United States v. Vederman, 225 F. Supp. 3d 308, 310 (E.D. Pa. 2016) (quoting Smith, 793 F.2d at 88)).

## III.    DISCUSSION

### A.    Marx Failed to Show He is Not a Flight Risk

In determining whether Marx was a flight risk, I considered, *inter alia*, the following factors:

> (1) the nature and circumstances of the offense; (2) the defendant's family ties; (3) the defendant's employment status; (4) the defendant's financial resources; (5) the defendant's character and mental condition; (6) the length of defendant's residence in the community; (7) any prior criminal record; and (8) any flight or failures to appear in court proceedings prior to or during the time of trial.

United States v. Georgiou, No. 09-88, 2010 WL 701892, at *2 (E.D. Pa. Mar. 1, 2010).  "[T]he defendant must carry the burden of meeting this high standard."  Id. at *1.

Marx presented no evidence respecting flight.  (See Tr. 24:21–26:1.)  Rather, he argued primarily—and continues to argue—a single Georgiou factor: that before sentencing, he had never failed to appear in court.  (Id.; Doc. No. 162 at 4–5.)  Marx thus effectively argues that this factor is dispositive because his pre-sentencing "circumstances have not changed."  (Doc. No. 162 at 4.) I do not agree.

Marx had vigorously urged that because he dramatically reformed his criminal ways (after the Government began investigating him), I should impose "a sentence of probation (and, at most,

4

limited home confinement if the Court deems it necessary)." (Doc. No. 147 at 2.) I did not find this persuasive or reasonable, and sentenced Marx to a year and a day of imprisonment. (See Doc. Nos. 157, 161.) Now that I have imposed that sentence, "there can be no mistake as to the consequences of remaining in custody." United States v. Bertoli, 854 F. Supp. 975, 1159 (D.N.J.). "The risk of flight at this stage of the proceedings is, therefore, a great deal more pronounced than at the pre-sentencing stage." Id. (denying the defendant's motion for bail pending appeal, even though the defendant had been at liberty before sentencing).

Moreover, in reviewing Marx's Presentence Report, I learned that his net worth is over $4 million, with nearly $2 million in liquid assets (including over $72,000 in cash and over $1 million in cryptocurrency). (PSR at 13–15, 17.) That Marx, after being sentenced, "has access to the financial means to flee weighs strongly against granting him bail pending appeal." Bertoli, 854 F. Supp. at 1159–60. When combined with Marx's extended period of financial fraud and dishonesty—almost two years—his readily available wealth also weighs against release. (Tr. 14:10–24.)

Finally, Marx asked me to delay his imprisonment so that he could get his affairs in order. (Sealed Tr. 7:19–24.) Because this was Marx's fifth sentencing date, however, he had ample time to get his affairs in order. (Doc. Nos. 135, 137, 138, 142, 152.)

**B.      The Appeal is for Delay**

Marx "has waived his right to appeal and raises no exception stated in his Guilty Plea Agreement." United States v. Doreian, No. 24-304, 2025 WL 269165 (E.D. Pa. Jan. 22, 2025), aff'd, No. 24-3379, 2026 WL 788902 (3d Cir. Mar. 20, 2026). Moreover, because the Agreement bars him from raising the issues that he now seeks to raise, he "cannot demonstrate that his appeal . . . would present substantial questions of law or fact likely to result in . . . a reduced

sentence." United States v. Alkhawam, No. 06-1001, 2008 WL 4845256, at *2 (D.N.J. Nov. 6, 2008) (denying the defendant's motion for release pending appeal when he sought to raise issues barred by his plea agreement's waiver of appeal provision). Even if those issues fell within any of his Agreement's appeal waiver exceptions, Marx failed to raise those issues at sentencing.

In any event, Marx's appeal does not present any substantial questions of law.

*The Ill-Gotten Gains*

Marx argues that: (1) my characterization of the $1.4 million he obtained through trading Belacoin as "comprised entirely of 'ill-gotten gains'" was not supported by the record; and (2) I erred by imposing disparate sentences on Marx and Roughton, based upon my consideration of those ill-gotten gains and the resulting disparate net worth of the two co-conspirators. (Doc. No. 162 at 8–12); 18 U.S.C. § 3553(a). These are hardly substantial issues.

Marx argues that there is "[n]othing . . . in the record" indicating that the "$1.4 million was 'ill-gotten gains.'" (Doc. No. 162 at 9.) Yet, it was Marx who raised the following objection to the Presentence Report:

> Paragraph 23 states that Marx "withdrew approximately $3.5 million worth of Bela," yet both the defense and the Government's experts calculate Marx's profits from trading Bela to be approximately $1.4 million.

(PSR at 22; see also Doc. No. 147 at 13.) At sentencing, I agreed, thus finding that Marx's profits from trading Belacoin were approximately $1.4 million. (Tr. 4:8–25.) In pleading guilty, Marx admitted that from September 2016 to May 2018, he repeatedly made false, fraudulent statements about the value and viability of Belacoin to induce cryptocurrency traders to purchase Belacoin and drive up its price. (Govt. COP Memo at 6–8; Doc. No. 154 at 18:5–19:12.) Marx was wildly successful: he continued to trade Belacoin as its price went from $0.00291 per coin to $0.2168 per coin—an increase of over 7,350%. (Govt. COP Memo at 8.) Marx now contradicts those

6

admissions when he argues that there "is nothing in the record" to show that the $1.4 million were "'ill-gotten gains.'"  (Doc. No. 162 at 9.)

Marx also urges that I erred in basing the sentences I imposed on him and Roughton in part on their Belacoin trading profits (approximately $1.4 million for Marx and $92,000 for Roughton) and their resulting net worths (over $4 million for Marx and $143,000 for Roughton).  (Doc. No. 162 at 10–11; Tr. 17:9–19.)  The law provides no support for this dubious suggestion.  First, "a defendant does not have a right to be sentenced equally with his co-defendants."  United States v. Quiles, 618 F.3d 383, 397 (3d Cir. 2010).  Nonetheless, "just as a court should ensure that it does not create sentencing disparities among similarly situated individuals, it should also ensure that its sentences appropriately reflect the relative culpability of individuals who are not similarly situated."  United States v. Negroni, 638 F.3d 434, 447 n.12 (3d Cir. 2011).  That Marx made vastly more money from the fraudulent scheme than Roughton reflects Marx's greater culpability. See, e.g., United States v. Geevers, 226 F.3d 186, 194–95 (3d Cir. 2000) ("We think that a defendant who falsifies checks for large sums of money is more culpable than one who does so for lesser sums.").  Indeed, Marx did not object to Probation's determination that he was the dominant trader of Belacoin.  (PSR ¶ 23.)  Moreover, Roughton's cooperation was "a key factor in Marx's decision to also plead guilty."  United States v. Roughton, No. 21-110 (E.D. Pa., June 16, 2021), ECF No. 9 at 10.

Weighing these factors, I determined that Marx was far more culpable than Roughton and sentenced each accordingly.

*Fine Amount*

Marx argues that I "clearly erred when calculating the Guideline range for the maximum fine" because my judgment reflected a Guideline fine range capped at $975,710, whereas the

7

Presentence Report represented that the Guidelines capped the maximum fine at $75,000.  (Doc. No. 162 at 7.)  He argues that my imposition of a $500,000 fine was thus significantly greater than Marx's "correct" Guideline amount.  Marx thus ignores the law and his Guilty Plea Agreement.

Guidelines Subsection 5E1.2(c)(2), which "limit[s] the maximum fine, *does not apply* if the defendant is convicted under a statute authorizing [] a maximum fine greater than $500,000." USSG § 5E1.2(c)(4).  "In such cases, [I] may impose a fine up to the maximum authorized by the statute."  (Id.)  Marx's Plea Agreement provides that the statutory maximum fine I could impose was "250,000 *or twice the gross gain or gross loss as determined by the Court, whatever figure is greater.*"  (Doc. No. 113 ¶ 4); 18 U.S.C. §§ 2571(b), (d).  Once again, I found that "the Government, with its expert report, has demonstrated" "market-wide losses" of "$487,855."  (Tr. 4:25–5:6.)  Accordingly, the statutory maximum fine was double $487,855—that is, $975,710. The Guidelines' maximum of $75,000, which might otherwise apply to Marx's unadjusted offense level thus does not apply here, and the $500,000 fine I imposed was squarely within the advisory Guidelines range.

## IV.    CONCLUSION

Marx is not entitled to release on bail while he pursues an appeal that borders on the frivolous.  Marx twice waived the issues he seeks to pursue on appeal.  Moreover, there is neither substance nor arguable merit to those issues.  Rather, even after four continuances of his sentencing, Marx still seeks to put off serving his sentence.  That is why he seeks bail pending that appeal.  In these circumstances, I am compelled to deny his Motion.

An appropriate Order follows.

April 7, 2026

*/s/ Paul S. Diamond*
Paul S. Diamond, J.